Thank you, Your Honor. May it please the Court, opposing counsel, my name is Robin Hammond, and I'm an assistant federal defender in the Billings Federal Defenders of Montana office. It's like we have the entire, almost the entire federal defender over here today from Montana and part of the U.S. Supreme Court. And, Your Honors, I am here today representing Mr. Robert Romo in this appeal. Mr. Romo's case, as you can see, proceeded at a suppression hearing and then to trial and to sentencing. Ultimately, he was convicted of a violation of 18 United States Code, Section 871, specifically with threatening the President of the United States. That requires a mailing, doesn't it? I'm sorry, Your Honor, I didn't quite hear. The statute requires a mailing of the threat? The statute itself, I don't believe, actually requires a mailing. Do you have that statutory language right there? I don't have the statutory language. I do have the Ninth Circuit jury instructions. Actually, the statute says knowingly and willfully deposits for conveyance or for delivery from any post office or by letter carrier any document containing a threat to take the life of the President, et cetera. Or knowingly and willfully otherwise makes any such threat against the President. I think it's – well, that's what the statute says. So you can tell us how you think that figures in to Mr. Romo's situation. Yes, Your Honor. And the jury instruction follows the lines of the statute. Essentially, there are two issues that the government has to prove beyond a reasonable doubt. First, that the defendant intentionally threatened, either in writing or orally, to kill or injure the President of the United States. And secondly, that under the circumstances in which the threat was made, a reasonable person would foresee that it would be understood by persons hearing or reading it as a serious expression of an intention to kill or injure the President of the United States. The first issue that arises in this appeal is whether or not the investigation of this case violated Mr. Romo's confidential communication – right to confidential communications under the Due Process Clause of the Fifth Amendment. The government has argued that this kind of communication was not privileged. Essentially, the government adopts the district court's holding, which states that there was no confidential communication in existence at the time that Mr. Romo and his counselor, Mr. Don LaPlante, communicated about this issue. It's our position that the record speaks clearly to the contrary. As I'm sure this Court has noted, during the suppression hearing itself, Mr. LaPlante testified that not only had he had previous confidential communications with Mr. Romo, but during the communication at issue, when asked if he would disclose his notes about that communication, said no. These notes are covered by the confidential communication privilege. Can I – there's three things going here that get mixed up, so it would help me if you tell me which one you're talking about. Number one, there's a federal evidentiary psychotherapist privilege. There is a state confidentiality statute that has an exception for harm or threats. And number three, there's a, as I understand it, a Fifth Amendment challenge based on compulsion. So which one of these – because each one of them is going to rise and fall on different legal standards, so I think you need to separate among those. If you would, it would help me. Okay. Thank you, Your Honor. I'm going to start with the violation of Federal Rule of Evidence 501. And in that context, the due process – the Supreme Court has stated in Jaffe v. Redmond that the due process clause of the Fifth Amendment protects this kind of privilege. And it's expressed in Rule 501 of the Federal Rules of Evidence. It's that specific privilege that I'm going to speak about first. And with respect to that particular relationship between Mr. Romo and Mr. LaPlante, it's our position that that privilege was fully enforced and that there was no exception that applied to that particular privilege. Okay. One question about that. I would understand that the therapist can't give testimony without violating the privilege based on Chase. I think we held that there. But it seemed to me that the therapist could make a complaint or advice to law enforcement, to the FBI or otherwise, saying this person threatened the President, right, and that there's no rule of confidentiality when there's a threat involved. So am I right in that distinction? I think you – It was error for the therapist to testify under Chase, but it was not error for the therapist to alert the FBI. And, Your Honor, it's our position that it was actually error on both counts in this particular case. The reason for that is that there was no immediacy with respect to the conversation that he had with Mr. LaPlante on the date in question. In other words, what he said – what – according to Mr. LaPlante, what was said at that meeting was Mr. Romo says something along the lines of, I've done something really stupid. I wrote a letter to the President of the United States, all in past tense. Also the sense of regret. Also – But didn't the letter say some – didn't he say the letter said, The President deserves to be blown away or shot, and I'm the guy who can do it or something like that? He said that in the context of a letter that he said had been written. Right. I understand. But the threat suggests that apart from saying the letter, that he might do something. And I – Which is perspective content. So I'm not really following your argument that the therapist couldn't alert the police. So at least I'm having trouble with that. Okay. And let me see if I can explain it a little bit better. Maybe you could just tell us what's the principle of law under the testimonial privilege that prevents the therapist from saying to the FBI, this guy's threatening the President? Well, it's covered by the due process clause of the Fifth Amendment. And essentially it says that unless there is an immediate threat as defined by the Tarasoff case, which is described in our brief, that generally that exception to that privilege is not going to apply. Now, Montana law specifically also – Okay, well, even if that's true, what happens? He then goes and he's talking to the officer. They give him his Miranda rights, which he waives. And then he tells it all over again. So doesn't that break any chain? Well, Your Honor, it's our position that the chain is not broken and there's no purge to the taint. And it's our position that that's the case because, first of all, Mr. Romo has been informed that the Secret Service agent is there specifically because his counselor has violated the privilege. The Secret Service agent has entered into this interview already knowing everything that was disclosed during this confidential communication. And I'm still confused, though, about this due process violation because if in Chase or somewhere, if it's part of – if there's some compulsion, it seems to me that you have this Fifth Amendment issue potentially. But I don't see any compulsion here. So what is the best case you have that we would look at to see the claimed Fifth Amendment violation? Well, there are really two Fifth Amendment violations that are raised here. The first is the due process violation. And that is addressed in United States v. Chase, but it's also addressed by the Supreme Court in Jaffe v. Redmond. And in that particular case, the Supreme Court explicitly includes the kind of communications that took place between Mr. Romo and Mr. LaPlante, who was a licensed social worker and licensed professional counselor. So there's this due process right to confidential communications, confidential privileges. It includes the spousal privilege, and it also includes this doctor-patient privilege that covers under its umbrella the communications we had here. Then there's the Fifth Amendment privilege against self-incrimination, which goes to the voluntariness of the statement. It's our position that because Mr. Romo was under the impression at the time that this communication to his counselor should have been considered to be confidential, that it wasn't a knowing and voluntary kind of confession. Whether it is or not, if the counselor is permitted to reveal a threat, then it seems to me that it doesn't matter whether he thought when he talked to the counselor that it was voluntary or confidential or whatever. What matters is can the counselor disclose the threat to law enforcement. And in Chase we cited this language from Tarasoff that says, when a therapist determines that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, and they include warning the intended victim or others or notifying the police. That's the language that we cited in Chase. And we didn't say that that threat, at least there, we didn't say that the threat could only be revealed if there was immediacy to it. So what am I missing there? Because I'm still hung up on the idea that it was absolutely correct for the therapist to alert the police. Then when the FBI goes and interviews him and they give him Miranda rights, it seems to me that we have a whole different voluntariness setting. So what am I missing in my analysis? I'd like to add to your analysis that this fellow was going to be evaluated to get out of prison very shortly, so that it's not like a person there with a life sentence who's not going to be able to get out. So there may be immediacy also. Well, it's interesting because specifically Mr. LaPlante testified at the suppression hearing that there was not an immediacy. He testified that there was an eminence. He felt there was eminence, but not an immediacy. And that's on page 18 of the excerpts of record. And the Tarasoff exception itself does describe a requirement that there be some sort of immediate serious threat. Well, not in the language from Tarasoff that we quoted with approval in Chase, which I just read to you. And, well, and, Your Honor, added to that is the Montana, the State of Montana requirements, which is found in Montana Code Annotated Section 27-1-1102. And that requirement says, A mental health professional has a duty to warn of or take reasonable precautions to provide protection from violent behavior only if the patient has communicated to the mental health professional an actual threat of physical violence by specific means against a clearly identified or reasonably identifiable victim. Well, he did that here. He did that. And he says, you didn't write anything threatening to the President, did you? He says, yes, I did. So he threatens an identifiable person, the President. I don't know how the therapist could interpret it otherwise, could he? The issue that I'm more, at least as one judge, I'm more interested in is I'm assuming that it was correct for the therapist to disclose the threat, even though I recognize you're arguing not immediate enough. But I think with the President of the United States and the special statute about that and what was said and what Chase says about Tarasov, at least for me that part's okay. But then when the therapist testifies, that's not okay. So the question then becomes, is it harmless error? At least in my mind, it seems to me it was error for the therapist to testify. And the question is, is that harmless in light of the admissible, in my view of the case, evidence of what he said to the law enforcement people questioning him? Were you going to address harmless error? And yes, Your Honor. It's our position that it was not harmless error, and specifically so because the therapist testified about, he testified about a conversation that specifically he had had with Mr. Romo about Mr. Romo mailing this letter. In addition, he testified about the chain of events that initiated the investigation in this case. And that also leads to a second issue, the United States v. Hanna issue that arose at trial. There, what happened is the woman who was the head of White House mail actually testified that had she received a letter like that in the mail, which, by the way, she never did, but had she received that letter, she would have considered it to be a threat. We objected to that testimony at trial based upon the holding of United States v. Hanna, which specifically holds that the reasonable person determination is left, should be left in the hands of the jury. The Hanna case. You know, let me ask you this. If you have the transport sheet, which I'm not going to quote the language from here, but it basically he's saying, George Bush, you know who's coming to kill you. So you have your written document, and then you have his very clear statements to Agent Thomas, and he's asking him, what would you do if you saw the President? I would punch, hit or shoot the President. Why isn't that sort of on point dead bang evidence that would convict you under the statute, and the other is literally it's the same evidence, but there's no taint on either of those, is there? Well, there isn't in the sense of what we're discussing. However, there is, of course, the concern that, which is our third argument, that there is the lack of sufficiency with respect to those other two claims as well. Because when the Secret Service agent did speak with Mr. Romo, he posed a hypothetical. And so what Mr. Romo said was not a specific threat. It was a response to a hypothetical question posed by the Secret Service agent. And likewise, with this inmate report that had the offensive language written on it, that was something that was located in a tub, a closed tub located in the cell that Mr. Romo was staying at the time. It's our position that those two alleged communications simply do not establish proof beyond a reasonable doubt of the two elements as set out in the statute. And, Your Honors, if there are no further questions, I'd like to reserve my remaining two minutes. I guess the only other question, though, is didn't, apart from the hypothetical, didn't he tell the Secret Service that he was going to put a bullet through the President's head? Is that, I guess I'm just having trouble understanding why that's not unequivocal evidence here. Is there something about that statement that is not on the record or is not, is tainted by some other evidence? The statement, just so I'm clear, the statement that the Secret Service agent said was made to him, it's our position, Your Honor, that that particular statement was made in the context of a hypothetical. And so, therefore, it didn't constitute an active threat. It was a statement in response to a hypothetical posed by the Secret Service agent. If George Bush ever appeared in the Dawson County Jail in Glendive, Montana, what would Mr. Romo do? And Mr. Romo was not, according to Mr. Thomas, it wasn't the kind of situation where Mr. Romo said, I want to hurt or injure the President. Well, if he were here, then maybe I would do this. It's our position that that doesn't constitute a serious or specific threat under 871. Thank you. We'll give you a short time for a rebuttal as well. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Counsel. My name is Jim Secora. I'm the Assistant U.S. Attorney for Montana. I was trial counsel in this matter. If I may start out respectfully, I believe the facts in the very first instance of which the argument is premised is that Ms. Hammond says that the defendant expected it was confidential. The facts belie this. What happened is the counselor is no question in the record that he had talked with him before. And when he testifies not only at the suppression hearing but at trial, he says, I don't have a clue why he called for me to visit. He sat down, says, hi, how are you. He'd known him before. He did not consider any type of confidential session. In fact, he made his notes, this is not a privileged session. It's not a privileged communication. But isn't that in the eye of the patient, not the counselor, whereas whether it's therapy is in the eyes of the counselor? Absolutely. But there's nothing in the record, Your Honor. Nothing in the record. The defendant didn't take the stand. No one took the stand. All the evidence shows, including the testimony from his therapist, I told him. I said, is that something dumb? He says, you know, I'm going to have to report this. It's almost like a Miranda warning from a psychotherapist. I'm going to have to report this. Then he goes on, after his counselor, not anticipating it to be confidential, said, I'm going to have to report it. Then the defendant says, I threatened the President. I wrote this letter. And he explains what he had. I think in the very first instance, Your Honor, Judge Gould, I think there's no question right there that that's the crux of the first count, the first alternate in the count. And at page 177 of the excerpts of record, the actual, and Ms. Hammond read it, were the two-pronged test in which we had to make a determination to the jury, whether it was oral or writing. And that's the statute, 871. And the second part of it is the reasonable person theory. If, in fact, you, not the psychotherapist, not the FBI agent, you as a reasonable person reading this would determine it to be a threat. And the United States submits each one of the three counts, no matter whether it's a confession by the Secret Service, whether it's a letter we were never able to find who presented it in the form of his confession, or the third item, his posting in which he wrote in the jail log threats to the President, in which he actually signed it and put his finger, his thumbprint on it. I know, Your Honor, I apologize. We don't charge people with being smart in these cases. But it's this defendant. What about an insanity defense? Was that ever raised? Well, and I think it goes in tune, and I think Ms. Hammond would agree with me. There was discussion on the record that he was fed up with the state system. He was losing his good time. And I think he wanted to spend some time in federal custody. Whether or not that's perceived better time than state custody in Montana, that's a – but I think it goes hand in hand. He must be desperate. I know that was intimated in the record that he wanted to jiggle his system. I think that's what he said in the record. The jailer that testified who found that basically asked him, what the heck are you doing this for, and he was concerned that he was going to lose his good time, he was going to stay in the state system for a while, and he wanted to go into federal custody. So getting back to the number one, the letter that we never found was the actual initiation of the threat. We believe because the counselor – and as I've indicated, I cannot strongly indicate, there's no evidence whatsoever that this defendant thought it was confidential. In any way, as part of a counseling session, with Chase and Beatty in mind, there was no written agreement that anything he told this guy was confidential. It wasn't in the context of a counseling session. It was not right after a counseling session. The defendant called the therapist to talk to him. He said, I did something stupid, you know, and the therapist said, I'm going to have to report it. He then talks about it, admits to him. It's after that that he then contacts the Secret Service, and once again, it's a separate incident, which the Secret Service comes the next day, mirandizes him. There's no coercion. There's no Fifth Amendment issue. He once again repeats what he said to the therapist, the words in which he wanted to kill George Bush, and then he poses the question, what would you do if he's here? I'd hit him. I'd shoot him with a zip gun. There's ample or more than ample evidence of the threat outlined in the statute. The only question I've got is whether you can distinguish Chase in the sense that it seemed to me the therapist should not have testified, that he should have disclosed the threat to law enforcement but should not have testified. Chase and Beatty, both of those cases, the Ninth Circuit, it's counseling sessions. It goes beyond where it goes to the supervisor and says, I think this person is going to hurt someone else. What should we do? The supervisor, it's almost like it's an undercover thing with a therapist. This is completely different factual, Your Honor. How do we review that? I'm looking now at the district court, and he came out where you're proposing we come out, which is basically say it's not a counseling or treatment session. It wasn't under some privilege. Do we look at that de novo on that? That was made in connection with a motion to suppress. Do we look at that issue de novo, or then do we look at it in the trial in terms of an abuse of discretion for letting him testify? I think it's a combination of both, and that's what we put in our brief. I think it's an overall de novo that you look for abuse of discretion. And the fact finding, in those facts, once again, the court said it's totally devoid of anything other than pointing to it was not a psychotherapy session, it was not a counseling session in any manner. One other question that I think counsel raises a good point on is this Hanna issue. You have some nice lady from the White House who comes in and she handles mail, and she basically testifies on the ultimate issue of threat. Why is that harmless? I disagree with that. Hanna stands for the proposition they had three Secret Service agents and another police officer testifying as experts. This was truly erotic, and if you read closely, it was perhaps my inartfully drafted question in which she responded. I said, was this a serious threat? And you could just see her government mentality say, I would take it as a direct threat, because she has a protocol. She wasn't saying, oh, this is terrible, they threatened the president. She said, if I were to see these words, which the defendant had confessed to, I would take it as a direct threat, and this is protocol that I would follow. She didn't do it with great passion. She was just explaining her job. I understand it was a short statement, but should she have been testifying to that at all? I think if we had the letter, she wouldn't. If we would have had the letter, we would hold it up to the jury and say, here it is. But we had to establish, I believe, from the beginning, from his confession to the jailer saying, yes, I got the White House's address out of the library, and he mailed the thing, to showing why we didn't produce it for the jury. We have that. But that's different, you know, how many thousands of letters and where do they go, as opposed to hypothetically, if there were a letter and it said this, would that be a threat? And then she might as well have been a Secret Service person testifying. I mean, she was testifying at that point almost as an expert and, secondly, as on the ultimate issue that the jury is supposed to decide. So why is that harmless? Your Honor, in Hannah, there were no – Why is it harmless here? I mean, that's the question that is raised by the – I think it's harmless. If I may, I want to refer to Hannah. Hannah had all these biblical quotations in 666 and all kinds of things, which they called experts in to say, this is really a threat and I think it's a threat. What happened was we were saying, if you received a letter that said, someone should have put a bullet in your head and I'm willing to do it, how would you consider that? A direct threat. And this is how we'd handle it. We'd fingerprint it. We'd hold it. We'd give it to the Secret Service and in an instant they'd have it out there. But, counsel, all you needed to show – you wanted to tell the jury why they didn't have – you didn't have the letter. All you needed to show that no mail was delivered to the White House in those months. Well, if I were – That's all that was appropriate. If I were a good defense counsel, then I'd argue, look, if they get 35,000 pieces of mail, if she testified they get 400,000 on one day, this could have slipped by. They didn't find it. I think it's our duty and responsibility to establish why we didn't have the letter. You're sort of putting on your case like presenting Hamlet without Hamlet present in a way because someone might be looking for that letter. I understand that. But I'm still not sure that you can distinguish Hannah. I'm sorry, Your Honor. I'm not sure you can distinguish Hannah. I think – You're saying not that it's harmless error but that it wasn't error at all to have her testify. I think that's correct. But if it was error, was it harmless? I think there's no question it's harmless. When you read in the context of those words a reasonable person with that quote, it doesn't take a mystic, it doesn't take an expert to decipher what those words mean, whether or not it's a threat. It doesn't take an expert imposing his years of experience saying I've read this and when I see in the letter someone put a bullet in your head, I'm willing to do it. I don't know. You better show us why it's harmless and your argument should run as to what the other evidence is. It's overwhelming and I think it's harmless in regard to the first alternate in the count in that relation because two-point instruction, whether it's mailed or not, whether it's orally made and whether or not the reasonable man would anticipate it to be so. She was not substituting her judgment for the reasonable person under the theory that this Court has established. So you're still arguing whether it was error or not. And I'm saying to you that I suspect that this bench thinks that it was error. So you better turn to what harmless error means in this context. The facts of this particular case, the harmless error analysis. Are you referring, Your Honor, to just the first instance, the first alternative or the second or third alternative in the indictment? I don't understand your question. I'm saying. Judge Fletcher is asking you what other evidence is in the record other than the White House, you know, manager's testimony that would have led a jury to think this was a reasonably objective case. The defendant admits to the therapist what he wrote. He admitted to the jailer that he had mailed it to the White House. He admitted it to Dave Thomas, the Secret Service agent, that questioned him. And in addition, the White House person was just a method of explaining why we didn't have the letter, which the defendant admitted that he wrote, Your Honor. And I think the evidence was so overwhelming that it's in the context of this case. The second part is Mr. Thomas himself. Separate in part Miranda warnings given to the defendant. The defendant waived them and once again admitted it by his confession. The third part, we have the actual document was introduced into evidence, which is the only document we have attached to a supplemental excerpt of record, if the Court has seen it, which the defendant signed a jail transfer, but it had his picture on it. He signed it and put his thumb with the language threatening the precedent, which meets the burden under the two-prong test under the instruction, whether it was made orally or in writing, as a threat to the President. What a reasonable person. Would that jail transfer sheet be sufficient to convict him in and of itself? I think any one of the three alternates. And Judge Haddon gave unanimity instruction to the jury, and it sits right there on page 177. You must find any one of the alternate. Whatever one you find, you must find it beyond a reasonable doubt. I think any one of these is sufficient to satisfy the statute, Your Honor. Does the Court have any other questions? I don't think there's anything further. We'll hear from Defense Counsel on rebuttal. Thank you, Your Honor. Thanks for your travels to argue for us. And thank you, Your Honors. Just briefly, I want to reiterate why it's our position that the error at trial under Hanna did not constitute harmless error. While it is true that Judge Haddon did read a unanimity instruction to the jury at trial, we don't know which of the three theories Mr. Romo was convicted on. What we do know is that at trial, the bulk of the prosecution's evidence had to do with the first theory, that being the letter that was allegedly written that came out of the discussions between Mr. Romo and Mr. LaPlante, obviously, which it's our position that his testimony constituted prejudice and should not have been allowed at trial. Secondly, Ms. Roddick's testimony, the woman who was the head of White House Mail. Mr. Sikora has stated that this is very different. She was the head of White House Mail. She wasn't a Secret Service agent, as was the case in Hanna. It's our position that this is an even more egregious violation because of her position as head of White House Mail. Accordingly, Your Honors, Once the language is known, though, assuming she should not have testified it, once we know what he said, what his letter said, why wouldn't a jury have to find that is, objectively speaking, a threat? Without regard to whether she said it was the worst threat she'd heard in 30 years or the, you know, the middle-of-the-range threat, I mean, just the language itself, I'm having trouble viewing that language as other than a threat or even seeing an argument it's not. Well, Your Honor, the Hanna court expressed particular concern with the influence that the Secret Service agent's interpretations of the threat, alleged threat in that case, may have had on the jury. Here we have the same concerns. And there's also the issue of whether a reasonable person, it's not just whether it was a threat, but whether a reasonable person would foresee that it would be understood by persons hearing or reading it as a serious expression of an intention to kill or injure the President of the United States. So it's not just whether it's a threat, but it's also whether it's a serious indication. And Ms. Roddick's testimony was that this wasn't just a threat. This was a direct threat. This was the most serious kind of threat that the White House Correspondence Office ever dealt with. Thank you. Thank you, Your Honor. The case of United States v. Romo is submitted. And for after argument, I want to thank all counsel from Montana. This ends our Montana session. We will now move to Alaska. Can I take a break? Yes. And we'll take a break so you can get set up. And the next case will be the NRA.
judges: B. Fletcher, McKeown, Gould